## Abram Pennypacker et al., Plffs. in Err., v. Richard Pennypacker et al.

The presence of a brother and a nephew of the testator at the making of
his will, in which they are legatees, does not, without more, raise a presump-
tion of undue influence.

The question of testamentary capacity is for the jury.

The burden of proving mental unsoundness is always upon those who al-
lege it.

If, however, general or habitual unsoundness of mind be shown previous
to the will, the burden of proving a lucid interval or restoration to sanity,
at the time, is in turn thrown upon those who allege it.

If, at the time of making the will, the testator was sound in mind and
knew the business in which he was engaged, it is immaterial that he was,
mentally unsound before or after.

(Argued March 3, 1887. Decided March 14, 1887.)

July Term, 1886, No. 85, E. D., before MERCUR, Ch. J.,

GORDON, PAXSON, TRUNKEY, STERRETT, GREEN, and CLARK, JJ. Error to the Common Pleas of Berks County to review a judgment on a verdict for the plaintiffs (proponents) in an issue *devisavit vel non.* Affirmed.

The facts as they appeared at the trial before ERMENTROUT, J., were stated in his charge to the jury, which was as follows:

Some time in 1885 John Pennypacker, a bachelor, some sixty-four years of age, died; and at his death a certain instrument of writing, under date of November 7, 1879, was presented as his last will and testament. Richard Pennypacker, a brother of the decedent, and his children are here as plaintiffs, asserting that this paper is the will of the decedent. Abraham, James, and Charles Pennypacker, also brothers of the decedent, and Mary Huyett, a sister, are the defendants, asserting that it is not the will of the decedent, and that at the time of the execution of the paper the decedent had not sufficient mental capacity to make a will.

In passing upon this question you will carefully examine the evidence, laying aside all prejudice and disregarding all appeals to your sympathies. You are to judge in this case by the evidence that has been submitted to you, and not on mere passion, prejudice, and sympathy. And in order to enable you intelligently to consider the facts that are in evidence, the court will instruct you in such legal principles as may be applicable to the case. The counsel have presented certain points to the court, upon which they ask us to charge. These points embody certain legal propositions which, we are asked to say to you, form the law in this case. We will first take up the points presented on behalf of the defendants.

The defendants respectfully ask the court to charge the jury as follows, and to cause the requests and answers to be filed as a part of the record of the cause. . . .

"6. By the evidence in the case it clearly appears that the relations existing at the date of the will between Richard Pennypacker and John Pennypacker were confidential, and as Richard Pennypacker is named in the will as a beneficiary taking an estate for life under the will, and was present actively taking part in the formal execution of the will, the will is void and must be set aside upon the presumption of undue influence, unless the plaintiffs have satisfied the jury by clear evidence that

the will was the free, voluntary, and uncontrolled act of John Pennypacker, and was not obtained by undue influence; and if the jury believe that John Pennypacker was of weak mind at and before the execution of the will, the plaintiffs must also prove to the satisfaction of the jury that at the time the will was made John Pennypacker was of sound and disposing mind."

We decline so to charge. The issue of undue influence is withdrawn from the consideration of the jury.

"7. If the jury believe from the evidence in this case that at one time in his life, before the execution of the paper offered in evidence as the will of John Pennypacker, he was for a period of one or two years of unsound mind, and was ever thereafter an imbecile, and after the execution of the alleged will, he became a wild and raving lunatic; and if the jury further believe from the evidence in the case, that Richard Pennypacker transacted all of John's business and had charge of his estate and business affairs at the time of the execution of the alleged will and John was at that time an imbecile; and if the jury further believe from the evidence in the case that Richard Pennypacker and Adam Pennypacker, his son, beneficiaries in said alleged will, were present at the execution of the will, and that Richard Pennypacker obtained the lawyer to write the will and the witnesses to attest its execution and was present in the room actively promoting its formal execution, by directing one of the subscribing witnesses, Charles Rans, to sign his name to the will as a witness and to do his best, the law presumes the will to be null and void for undue influence, and in order to overcome the presumption, the plaintiffs in this case must have satisfied the jury by clear evidence of two facts: (1) That at the time John Pennypacker signed the will, he had enough memory, reason, and judgment to have an intelligent understanding of the property he possessed, and of its nature, extent, and value, and that he had an intelligent apprehension of the nature of the will he was making; and (2) that the making and execution of the will was the free and voluntary act of John Pennypacker's mind, and not the result of the undue influence or unlawful importunity of Richard Pennypacker."

This point is refused.

"8. Where a jury sees that at and near the time when the will sought to be set aside was executed, the alleged testator was,

in other important transactions, so under the influence of the persons benefited by the will that, as to them, he was not a free agent, and was acting under undue control, the circumstances may be such as to warrant the conclusion, even in the absence of evidence bearing directly on the execution of the will, that in regard to that also the same undue influence was exercised."

We answer this point as follows: While that may be true in law, the present is not a case for its application. The undue influence must be an influence exercised in relation to the will itself and not an influence in relation to other matters or transactions. Undue influence, to effect a will, must be such as subjugates the mind of the testator to the will of a person operating upon it. And in order to establish this, proof must be made of some fraud practised, some threats or misrepresentations made, some undue flattery, or physical or moral coercion employed so as to destroy the free agency of the testator; and these influences must be proved to have operated at the very time of the making of the will. There being, in the judgment of the court, no such circumstances shown in this case, the point is refused.

"9. In order to come to the conclusion that a will has been obtained by coercion, it is not necessary to establish that actual violence has been used or even threatened. The conduct of a person in vigorous health towards one feeble in mind may- be such as to excite terror and make him execute as his will an instrument (which if he had been free from such influence) he would not have executed. Imaginary terrors may have been created sufficient to deprive him of free agency."

We answer this point as follows: As a proposition of law, this is true, but the facts referred to are not the facts of the present case. There is no evidence in this case to show violence used or threatened; nor is there shown any conduct on the part of Richard Pennypacker, or any of the plaintiffs, exciting any terror, real or imaginary, in the mind of the decedent.

"10. If the jury should find that John Pennypacker's mind, from many years of mental infirmity and from long habits of dependence upon his brother Richard for direction and guidance, was not self directing, and was easily led into the channel of his brother Richard's suggestions; and if Richard was present at the time the will was signed, procured counsel to draw the will, and directed Charles Rans to sign as a witness and do his best; and if Richard, at and about or near the time

when the will was made, by the stamp of his firm mind on the weak and plastic mind of John (if the jury so find the facts), impressed there his wishes and views in regard to the disposition to be made by the will, and thus constrained the mind of John, and so produced and procured such a will as his brother would not otherwise have made,—the will is not the free expression of John Pennypacker's intentions, and must be set aside."

This point we also refuse.

"11. The relation existing between Richard and John Pennypacker, when the will offered in evidence was made, having been of a confidential and fiduciary character, and Richard having procured the attorney to write the will, and having been present and taken part in the formal execution of the will by directing one of the subscribing witnesses to sign his name to the will, and Richard having been one of the persons named in the will as devisees, and taking a life estate thereunder, the law presumes that the will was obtained by Richard by undue influence, and the plaintiffs having offered no competent proof to rebut that presumption, the will must be set aside, and the verdict should be for the defendants."

We decline so to charge.

Plaintiffs' counsel have also handed to the court propositions of law which they ask us to affirm, and charge the jury in accordance therewith. . . .

"2. There is no evidence in this case tending to disprove the positive testimony of Messrs. Wanner and Zieber and of the subscribing witnesses, that at the time he made his will he did have mind and memory sufficient to understand and intelligently direct the disposition he desired to be made of his property; and if, therefore, his testimony is believed, the verdict must be for the plaintiffs."

We answer this point as follows: The jury are the judges of the evidence, its nature and character. If, upon full consideration of all the evidence in this case, the jury believe the testimony of Messrs. Wanner and Zieber and the subscribing witnesses, that at the time he made his will he did have mind and memory sufficient to understand and intelligently direct the disposition he desired to be made of his property, the verdict must be for the plaintiffs. . . .

"4. That the fact that his brother Richard went for Mr. Wanner, called the subscribing witnesses, and some of the witnesses

testify that he and his son were present in the room when the will was signed, does not create a suspicion even as to the rectitude of the transaction. The law does not regard the presence of a brother and of a nephew at the time of the making of the will as improper, suspicious, or objectionable, although they are legatees."

This point we affirm, on the authority of Caldwell v. Anderson, 104 Pa. 199.

"5. There is no evidence of undue influence in this case sufficient in law to justify its submission to the jury."

This point we affirm.

"6. That if the testimony of the numerous witnesses called by the plaintiffs, together with the testimony of the persons present at the execution of the will, is believed, that John Pennypacker was possessed of mind, memory, and understanding to know what he was about; that prior to the fall of 1881 his only peculiarity was slowness of speech and a retiring disposition, but all his acts and conversations were sensible; that he never was known to have any delusions, or to talk irrationally, or to do any act showing a want of sound mind,—then he had capacity to make a will. The testimony that Richard did the buying and selling and attended to the general business of the farm becomes immaterial, and the verdict must be for the plaintiffs."

This point we affirm if the jury so find; but, in judging of the mental capacity of the decedent, the jury will consider all the evidence both of the plaintiffs and defendants.

"7. That the evidence of want of testamentary capacity and undue influence in this case is not sufficient to justify the jury in finding a verdict for the defendants."

We refuse this point.

As you will have observed, the question of undue influence is withdrawn from the jury. That leaves for your consideration but one point in this case, namely: Did the decedent, John Pennypacker, have sufficient testamentary capacity to make his will at the time of its execution on the 7th of November, 1879? This is the only question that you have now to consider. And I may say here that in consideration of that question there are a few principles of law that are well settled, and they will, in addition to what the court has already said, be carefully con-

sidered by the jury in passing upon this case. These legal principles are as follows:

As sanity, that is, soundness of mind, is the normal condition of men, the burden of proving mental unsoundness is always upon those who allege it.

Testamentary capacity, that is, the capacity to make a will, is presumed of everyone of full age, and the affirmative is with him who undertakes to call it in question; and this affirmative he must establish, not in a doubtful, but in a positive manner; and if, in weighing the evidence, the question is doubtful or balanced, a jury ought to incline in favor of disposing ability.

If, however, general or habitual unsoundness of mind be once shown to exist previous to the will, the burden of proving a lucid interval or restoration at the time of making it is thrown upon those who allege the fact.

I will also in addition read to you what is said upon the question of mental capacity in a late case decided by our supreme court, the case of Wilson v. Mitchell, 101 Pa. 503: "A man of sound mind and disposing memory is one who has a full and intelligent knowledge of the act he is engaged in, a full knowledge of the property he possesses, an intelligent perception and understanding of the disposition he desires to make of it, and of the persons and objects he desires shall be the recipients of his bounty. It is not necessary that he collect all these in one review. If he understands in detail all that he is about, and chooses, with understanding and reason, between one disposition and another, it is sufficient for the making of a will. . . . If, from any cause, he is enfeebled in mind, so as to be incapable of knowing the property he possesses; of appreciating the effect of any disposition made by him of it, and of understanding to whom he intends to bequeath it, he is without the requisite testamentary capacity: . . . 'He must have memory. A man in whom this faculty is totally extinguished cannot be said to possess understanding to any degree whatever or for any purpose. But his memory may be very imperfect; it may be greatly impaired by age or disease. He may not be able at all times to recollect the names, the persons, or the families of those with whom he had been intimately acquainted; may at times ask idle questions and repeat those which had before been asked and answered; and yet his understanding may be sufficiently sound for many of the ordinary transactions of

life. He may not have sufficient strength of memory and vigor of intellect to make and digest all the parts of a contract, and· yet he may be competent to direct the distribution of his property by will. . . .

"The question is not so much, What was the degree of memory possessed by the testator? as this—Had he a disposing memory? Was he capable of recollecting the property he was about to bequeath, the manner of distributing it, and the objects of his bounty? To sum up the whole in the most simple and intelligent form—Were his mind and memory sufficiently sound to enable him to know and to understand the business in which he was engaged at the time when he executed the will? . . . Neither age, nor sickness, nor extreme distress or debility of body will affect the capacity to make a will if sufficient intelligence remains. The failure of memory is not sufficient to create the incapacity, unless it be total or extend to his immediate family or property. The want of recollection of names is one of the earliest symptoms of decay of the memory, but this failure may exist to a very great degree and yet 'the solid power of the understanding' remain."

You will, therefore, observe that what the law defines as the mental capacity necessary to make a will is this: Were the mind and memory of the man who made the will sufficiently sound to enable him to know and to understand the business in which he was engaged at the time of the execution of the will? Did he know what he was doing? Did he have a proper idea of the manner and form in which he was disposing of his property and the parties to whom he was making that disposition? That is all the mental capacity that the law calls for in cases of this kind. It is a rule based upon sound principle, for all men are not created alike. One man may possess a very high degree of intelligence, another man may not. One man may be highly educated, another may have no education. One man may be able to read and write and to talk learnedly and intelligently, and another may not. But because a man cannot read or write, or has not received a high degree of education, he is not thereby prevented from making a will. Otherwise, people who walk in humble life and have not received much education or school learning might be judged incapable of transferring property which they have earned by their daily toil. All that the law requires is, Did the man at the time of

making the will understand the business in which he was engaged, and the disposition he was about to make of his property? If he did, his testamentary capacity is established. And if, under all the facts in this case, you believe John Pennypacker possessed that degree of mental capacity, you are bound to render a verdict in favor of the plaintiffs in support of the will.

Now, what is the evidence in this case? I do not propose to refer to the whole of this evidence, because that will be impossible. I would have to read over the notes of testimony to do that; you will recollect the details, for I can only refer to it in a general way, and I do so simply to explain to you the law which you are to apply to the facts in the case.

On the 7th of November, 1879, this paper was drawn up and signed by John Pennypacker. Under the act of assembly, every man of the age of twenty-one years has a right to make a will; and if he is a man of proper mental capacity, and attaches his name to a paper setting forth the disposition of his property, that is all that is necessary to be done by way of executing a will. It is not necessary to have subscribing witnesses to make a will good. The signature of a man to a paper of that kind can be proven; and, therefore, although there may be no subscribing witnesses upon a will, yet the moment that the paper is brought into court and witnesses are called who are acquainted with the signature, and they prove that this is the testator's signature, the law presumes that paper to be his will; and unless it is shown that there was a want of mental capacity to make that will, it will stand.

In the case before us, however, a paper is brought into this court, and its formal execution is proved by two subscribing witnesses. Now that does not make it a will so that no one can contest it; otherwise, there would be no issue framed for your consideration. But after this will is brought in and formally proved, the allegation is that the decedent had not mental capacity to make a will; and it is for this reason that this evidence has been produced for your consideration, and from which you are to determine the question of mental capacity of John Pennypacker.

There are various branches of testimony in this case. The one branch of testimony extends to a time before the signing of

this paper; another relates to the time of the signing of the paper, and still another to a time subsequent to its execution.

You will, however, always bear in mind that whether evidence is given as of the time before or after, that evidence becomes important only as it tends to throw light upon the condition of the man at the actual time of the execution of the will. Although in this case the decedent may have been of unsound mind before the making of the will on November 7, 1879, and although he may have been of unsound mind after the making of this paper, yet, if from all the evidence in the cause it is shown to you that at the time he did sign it he had sufficient mental capacity to know what he was doing, to know what he was about, to know the disposition he was making of his property, in other words, that he had sufficient mental capacity to make a will on that day, your verdict must be for the plaintiffs.

I have said that I do not intend to refer in detail to the evidence. Excluding James and Abraham Pennypacker, there were ten or more witnesses called on behalf of the defendants for the purpose of proving want of mental capacity. In addition to these twelve there were three physicians called, to testify as to their opinion upon what was stated to them to have been proven in the case. On the part of the defendants there were fifteen witnesses or more as to the mental condition of decedent, the witnesses stating facts within their knowledge, and three of them as to opinions from these facts. I mean, now, as to the fact of mental capacity or want thereof. On the other side, I think, some twenty-six witnesses have been called for the purpose of proving that he was of sound mind, and that he had proper mental capacity.

When the physicians were on the stand there were certain questions asked of them by both sides. The object of putting the questions to the doctors was to obtain from them an opinion regarding the mental soundness or capacity of the testator. In the questions that were asked of them, the physicians were bound to assume that everything stated in those questions on either side had been proven. I will read to you these questions which were asked of the physicians, because in their questions the defendants claim that they have embodied the facts which they have shown; while the plaintiffs also claim that in the

question they put to the physicians they have embodied the facts shown by them in the case.

The question asked by the defendants is as follows:

"If a person were so dull of understanding at eighteen years of age that, with the usual educational advantages of the community, he would be in the infant class in school with children ten years his junior in age; if he was very slow of speech and could not hold a conversation; would speak five or six words and then break off in an incoherent way; could not carry on a conversation; never had any idea of looking after his business; and being the owner of one half of a valuable farm and the stock thereon, and interested in the product thereof, would not do any work or anything unless directed by someone else; and who had a habit of standing at a place and looking on the ground for hours at a time, and this habit continued during all his life; and who, on or about thirty years ago, had delusions, said he was going to die, and be buried on a certain day, and chopped wood for his funeral, and when asked what he was chopping wood for, said: 'I will die; on Sunday the funeral will be, and they must have some wood to cook;' if he had the habit of saying there was something behind the house, if he had been there, of course it would be all right, but so it was away; it was not there any more; and if you would ask him what it was, he would not know, and would talk much about mad dogs, in a wild, incoherent way; would pass persons whom he knew, and when addressed by them, would not answer; would stand in the middle of a public road when a vehicle was approaching, and, although in the road way of the vehicle, would dumbly stand and compel the vehicle to drive around him; would go out on the public road without his hat, in the month of July or August, in a very hot sun, motioning and gesticulating strangely and looking wildly, and grinning, and when addressed by a person in the carriage whom he knew, were not to answer, but were to seize the shaft of the carriage and were to exclaim: 'If I only would not have done what I did,' and in answer to a question as to what he had done, were to reply, 'Yah! Yah! Yah!' would find pictures the only objects of interest in a book, and would show no interest in a book or newspaper, excepting in the pictures contained in the book or newspaper; would sit for hours writing his name on a slate, and nothing but his name; would sit on the earth and play with stones and dirt; would not buy his own

clothes, but have them bought by someone else; would do no business, although owning a considerable interest in a farm and farm stock,—what would be your opinion as to the sanity or insanity of that man, from the time described in this question, when he had delusions thirty years ago, up to 1880, five years before his death, assuming that the facts set forth in this question are true?"

And the answer which was made to this question was that he was insane or an imbecile. The jury will recollect the form of the answer.

After this question had been put to the doctors, and answered, Mr. Baer, on behalf of the plaintiffs, put this question:

"Suppose this man was able to read and write, and when he was about twenty-nine or thirty years old, he and his brother would take a farm and live on it, his brother managing the farm, he working and assisting; that his conversation was sensible; that he knew everybody in the neighborhood; that he made no mistakes of persons or things; that the only habitual peculiarity was a stoppage of speech and want of fluency; that what he did was entirely rational; that in 1856 he was sick for a year and a half, and during the time of the sickness he was under the care of Dr. Martin, and that the only facts testified to as to delusions were that during that period of sickness, covering a year or a year and a half, he had told this story about the chopping wood and dying, and this story of the mad dog; that when he recovered he continued to live with his brother, working on the farm, talking to people he knew; that in 1879 Mr. Wanner and Mr. Zieber went out, and with him in a room by themselves he told them that he wanted to give his property to his brother for life, and to his brother's children after his brother's death; that Mr. Wanner and Zieber wrote that out; that he signed the will with his own hand, of which this is the will (indicating); that he could write with his right hand and left hand; that he went out to gatherings in the neighborhood; and that no delusions nor insanity which took the form of delusions developed itself until two years after the making of the will; and that his brother testified that three years after the making of the will, when the insanity had commenced, the testator, in answer to his brother's question, told him that Mr. Wanner and Mr. Zieber had written a will for him, thereby showing his recollection of a fact that took place three years before,—would you say that

such a man had not mind enough to make such a plain and easy disposition of his property as is contained in this will?"

And to this question the answer substantially was that they would think that such a man had mind enough to make so plain and easy a disposition of his property, and that he had mental capacity enough to make a will of this character.

Now, you will observe that when these questions were asked of the doctors they were not required to have a personal knowledge of the facts contained in the questions, but they were bound to assume the truth of everything that is stated in the questions. It is for the jury to say whether or not the facts contained in these questions are true; and if the facts contained in the questions are true, then the answers of these experts would be opinions for the guidance of the jury.

But you will observe that these experts answered both these questions "Yes;" so that, assuming the facts set forth in these questions by the one side, the decedent could make a will; and assuming the facts set forth by the other side to be true, he could not make a will. It is for the jury to say what are the facts in this case. The facts set forth in either of these questions are all facts of this case; and the jury, in examining all the evidence, will consider what both sides allege, and they for themselves will find what are the facts of the case. The opinions which witnesses in the case gave were also in part for the guidance of the jury; but the value of an opinion which a witness may give in a case of this kind depends altogether on the facts which the witness may have testified to. And, therefore, when you come to consider the evidence of a witness, the first question that you will ask is, What did the witness testify to? If he gave an opinion upon the mental capacity of John Pennypacker, upon what facts did he base that opinion? Were they sufficient in your judgment to warrant the opinion he did express? If they were, that opinion is entitled to some weight, but if the opinion was not based upon proper facts, the opinion is not entitled to weight, although you are bound to consider the facts shown.

In other words, when the issue is one of mental capacity, you are not blindly to follow the theories of one side or the other. You are to use your judgment, your intelligence, your reason, in sifting the truth from all the evidence in the case. You are to take each and every fact, for the mental capacity of a citizen is to be judged by his actions, his speech, his conduct, his

behavior, and his appearance. You are to give every fact in this case due and proper consideration. You are to endeavor to harmonize everything the witnesses may have said; if you cannot, then you are to reject those facts which you cannot harmonize with each other; so that, you observe, this question of capacity comes right back to the jury, under the principles of the law which the court has laid down to you; and the question which you are to answer is, Was John Pennypacker, at the time of the making of the will, a man of proper testamentary capacity? Was he fit to make a will? Had he a proper idea of the business in which he was engaged? Did he know what he was about; what disposition he was making of his property; and to whom it was made? And in judging of that, the most important testimony is his actions, his declarations, his habits, his appearance, his conduct.

What took place before that day and what took place after that day are only important as they bear upon the question of his testamentary capacity at the time of the execution of the will; because that is the period of time that your verdict must determine the man to have been of sound mind and disposing memory.

I have already referred to the number of witnesses in this cause, and to the fact that, in judging the value of their opinions, you are to consider the testimony upon which such opinion may be based. As to the credibility of witnesses, you have heard them testify; they have stated their occupations, where they lived, how long they have known the decedent, their powers of judging, the conversations they may or may not have had with him, and they have told you different things as to the conduct, behavior, acts, and declarations of the testator which, in their mind, may have induced them on the one hand to believe that he wanted mental capacity, and on the other that he had mental capacity. It is for you to determine their credibility. You saw them on the stand; you saw their appearance, their character, the extent of their information, and the manner in which they testified, and as you find, so will your verdict be, either for the plaintiff or defendant. If you find that he possessed proper mental capacity on the 7th of November, 1879, your verdict will be for the plaintiffs; if otherwise, for defendants.

[I desire to call your attention also to what took place on the 7th of November, 1879:

From the testimony it appears that Messrs. Wanner and Zieber went out to the house of John Pennypacker on that day. It is said by those two witnesses that at the time of the making of the disposition of this property there was no one present but John Pennypacker; that upon being asked by Mr. Wanner what was wanted, he replied that he wished to make a will, and that thereupon, and in answer to questions of Mr. Wanner, he stated how he desired the will to be made, and dictated substantially what is set forth in this present paper as to the disposition of his property; that Mr. Zieber wrote down these facts; that having written them the will was read to John Pennypacker, and explained to him by Mr. Wanner, and that thereupon he replied that that was the way he wanted it; that thereupon witnesses were called in and the will was signed by the witnesses.

There is some conflict of testimony as to whether the will was signed before the witnesses came in or after; but at all events it appears from the evidence that the will was signed by the witnesses in the presence of John Pennypacker; that he attached his signature to the will. Mr. Wanner, Mr. Zieber, James Fry, and Charles Rans are the attorney, the scrivener, and the two subscribing witnesses. They all say that at the time of the making of that paper John Pennypacker was of proper mental capacity; that he knew what he was about, and that, in their judgments, he was fit at the time that paper was drawn up to make a will.

No other witnesses are called in this case to show anything that was said or done there upon that occasion, except these four people, and these four people agree in the one fact that he possessed sufficient mental capacity. Has their testimony been shaken by the testimony submitted here before or after, or is their testimony entitled to its full weight? If you believe their testimony, that John Pennypacker was fit to make a will, it is immaterial whether John Pennypacker was sound or unsound before or after, or before or after that day. If he was sound in mind and knew the business in which he was engaged, and what he was doing, then this will must stand, and the verdict must be for the plaintiffs.

If, however, after a consideration of all the evidence in this case, you should come to the conclusion that upon that occasion John Pennypacker did not possess such mental capacity, your

verdict must be for the defendants. If he was of sound mind, memory, and understanding upon that day, it is immaterial to whom he gave this property; for when a man is of sound mind and memory the law permits him to will his property to whomsoever he pleases in his own family or elsewhere; it is his own property and no one else's.]

I think now I have gone over all the principles in this case. You will take the legal principles which I have laid down to you, and in the light of these principles you will look at the facts in this case; after a careful consideration of all evidence, you will say how your verdict shall be—whether for the plaintiffs or for the defendants.

Verdict and judgment were for the plaintiffs.

The assignments of error specified the answers to the points quoted, and the portion of the charge inclosed in brackets.

*Benjamin F. Dettra, J. Howard Jacobs,* and *H. Willis Bland,* for plaintiffs in error.—Richard owed the highest good faith to John. John was his feeble minded brother, to whom he stood in the relation of a natural guardian. Besides, he was his cotenant, and for thirty years had taken the fruits of the farm, which they owned in common, to himself without account.

In defining fiduciary relations, Rapalje & Laurence, in their Law Dictionary, title, *Fiduciary,* say:

"Such is the relation between trustee and *cestui que trust,* attorney and client, principal and agent, and generally, wherever, from the position of two persons, one of them reposes confidence in the other."

Tenants in common by descent are placed in confidential relations to each other by operation of law, as to the joint property; and the same duties are imposed as if a joint trust were created by contract between them, or the act of a third party. Being associated in interest as tenants in common, an implied obligation exists to sustain the common interest. This reciprocal obligation will be enforced in equity as a trust. These relations of trust and confidence bind all to put forth their best exertions, and to embrace every opportunity to protect and secure the common interest, and forbid the assumption of a hostile attitude by either. Freeman, Cotenancy, § 151; Tisdale v. Tisdale, 2 Sneed, 599, 64 Am. Dec. 775; Van Horne v. Fonda, 5

Johns. Ch. 388; Lee v. Fox, 6 Dana, 171; Lafferty v. Turley, 3 Sneed, 182; Saunders v. Woolman, 7 Lea, 302; Williams v. Gideon, 7 Heisk. 620.

While equity does not deny the possibility of valid transactions between the two parties, yet because every fiduciary relation implies a condition of superiority held by one of the parties over the other, in every transaction between them, by which the superior party obtains a possible benefit, equity raises a presumption against its validity, and casts upon that party the burden of proving affirmatively its compliance with equitable requisites, and of thereby overcoming the presumption. 2 Pom. Eq. Jur. § 956.

The jurisdiction exercised by courts of equity over the dealings of persons standing in certain fiduciary relations has always been regarded as one of a most salutary description. The principles applicable to the more familiar relations of this character have been long settled by many well known decisions; but the courts have always been careful not to fetter this useful jurisdiction by defining the exact limits of its exercise. Tate v. Williamson, L. R. 1 Eq. 528, 536.

The relation and the duties involved in it need not be legal; it may be moral, social, domestic, or merely personal. 2 Pom. Eq. Jur. § 956.

That a strict legal relation need not exist is shown by the following cases: Revett v. Harvey, 1 Sim. & S. 502; Allfrey v. Allfrey, 1 Macn. & G. 87, 98; Espey v. Lake, 10 Hare, 260, 262; Beasley v. Magrath, 2 Sch. & Lef. 31.

The same general principle extends, with more or less force, to dealings between a physician and patient, a spiritual advisor and penitent, vendor and vendee of land, husbands and wives, and persons occupying their position, partners, and indeed all persons who occupy a position of trust and confidence, of influence and dependence, in fact, although not perhaps in law. Pom. Eq. Jur. § 963; Rhodes v. Bate, L. R. 1 Ch. 252, 257.

No part of the jurisdiction of the court is more useful than that which it exercises in watching and controlling transactions between persons standing in a relation of confidence to each other; and this part of the jurisdiction of the court cannot be too freely applied, either as to the persons between whom or the circumstances in which it is applied. Billage v. Southee, 9 Hare, 534, 540.

This court has adopted and enforced the most advanced equity doctrines upon this subject. Miskey's Appeal, 107 Pa. 611.

Whenever from such relation considerable authority or influence necessarily exists on the one side, and a corresponding reliance and confidence is placed on the other, a party will not be suffered to abuse this authority or influence by extracting any advantage to himself. Darlington's Appeal, 86 Pa. 518, 27 Am. Rep. 726.

Influence is a thing which is assumed as between father and child; not that the influence is assumed to be unduly exercised, but that the influence is assumed; and it is then thrown upon the father, if he takes any benefit, to prove what is called the righteousness of the transaction. Turner v. Collins, L. R. 7 Ch. 329.

The question is, not whether he knew what he was doing, had done, or proposed to do, but how the intention was produced; whether all that care and providence was placed round him as against those who advised him, which from their situation and relation with respect to him they were bound to exert on his behalf. Huguenin v. Baseley, 14 Ves. Jr. 273.

Wherever one person obtains by voluntary donation a large pecuniary benefit from another, the burden of proving that the transaction is righteous falls on the person taking the benefit. Hoghton v. Hoghton, 15 Beav. 278.

Persons standing in a confidential relation towards others cannot entitle themselves to hold benefits which those others may have conferred upon them, unless they can show to the satisfaction of the court that the person by whom the benefits have been conferred had competent and independent advice in conferring them. Rhodes v. Bate, L. R. 1 Ch. 252; Savery v. King, 5 H. L. Cas. 627; Comstock v. Comstock, 57 Barb. 453; Boyd v. De La Montagnie, 73 N. Y. 498, 29 Am. Rep. 197; Boyd v. Boyd, 66 Pa. 283; Cuthbertson's Appeal, 97 Pa. 163.

It is sufficient to invalidate any instrument by a person of weak intellect, to show that the person in whose favor it is framed held a situation of confidence with respect to the maker of such instrument. Jones's Appeal, 11 W. N. C. 261.

In Darlington's Appeal, 86 Pa. 518, 27 Am. Rep. 726, the instance was one of husband and wife, and in Miskey's Appeal, 107 Pa. 611, one of father and son; and the general doctrine is applied to transactions between other near relations, as, gifts

from a sister to a brother. Thornton v. Ogden, 32 N. J. Eq. 723; Hewitt v. Crane, 6 N. J. Eq. 159, 631; Sears v. Shafer, 6 N. Y. 268.

In these cases consanguinity has not been allowed to prevent the presumption, but the beneficiaries have all been required by the law to show affirmatively that the benefit to them was not a result of the abnormal influence inseparable from the confidential relation.

Where the alleged testator is shown by evidence to be weak in mind, whether arising from age, bodily infirmity, great sorrow, or other cause tending to produce such weakness, though not sufficient to create testamentary incapacity, and the person whose advice has been sought and taken receives a large benefit under the instrument propounded as a will, it must be shown affirmatively that the alleged testator had a full understanding of the nature of the disposition contained in it. Cuthbertson's Appeal, 97 Pa. 163; Boyd v. Boyd, 66 Pa. 283; Frew v. Clarke, 80 Pa. 180.

The rule is applicable not only to one who manually prepares the will, but to one who is instrumental to its preparation and assists in its execution. Rea's Estate, 11 W. N. C. 80; Wilson's Appeal, 99 Pa. 545.

In Wistar's Appeal, 54 Pa. 63, Judge ALLISON, in an opinion affirmed by the supreme court, speaking of dealings between persons who sustain the fiduciary relation, says:

"Where a claim is sought to be established by one holding a fiduciary relation to another, against the person or estate which he is required to protect, the burden of establishing the claim, both as to its fairness and consideration, rests upon him who asserts his demand. The principle on which courts act in regard to such claims stands independent of the ingredients of deceit, imposition, or unconscionable advantage, upon a motive of general public policy, and is designed to protect parties against overconfidence in those who have the care and management of their person, property, or estate."

Where there is no evidence of infirmity of mind at the execution of a will, and the subscribing witnesses are uncontradicted, infirmity may be inferred from anterior and subsequent facts. Irish v. Smith, 8 Serg. & R. 581, 11 Am. Dec. 648.

Subscribing witnesses are not always the best to prove the sanity of the testator. McTaggart v. Thompson, 14 Pa. 155;

Irish v. Smith, 8 Serg. & R. 581, 11 Am. Dec. 648; Rambler v. Tryon, 7 Serg. & R. 90, 10 Am. Dec. 444.

Where the testimony is voluminous and the jury would naturally rely upon and be largely influenced by the rehearsal of it by the court, it is important that the *résumé* should be as full on one side as the other, so that the jury may not be misled. Gehman v. Erdman, 105 Pa. 371.

A tendency to mislead in the general tenor of the charge, although no particular portion of it be erroneous, is ground of reversal. Washington Mut. F. Ins. Co. v. Rosenberger, 3 W. N. C. 16, 33 Phila. Leg. Int. 338.

Actual violence need not be established. Boyse v. Rossborough, 6 H. L. Cas. 47; Davis v. Calvert, 5 Gill & J. 302, 303, 25 Am. Dec. 282; 1 Jarm. Wills, p. 133, note Randolph & T. ed. 1880; Thompson v. Kyner, 65 Pa. 376.

*Howard P. Wanner, Jeff. Snyder,* and *Geo. F. Baer,* for defendants in error.—The language of the court in answering the contestants' eighth point is a correct statement of the law as the supreme court has time and again declared it. Tawney v. Long, 76 Pa. 115; Stokes v. Miller, 10 W. N. C. 241.

Where the testator is shown to be of weak mind, without regard to the cause or causes from which that weakness has arisen, although it be not sufficient in itself to wholly destroy testamentary capacity, and the person by whom, or under whose advice, the will has been written, being a stranger to the testator's blood, receives a legacy or bequest, large as compared with the testator's estate, the burden of proof shifts from the contestants to the proponent of the will. Caldwell v. Anderson, 104 Pa. 199.

PER CURIAM:

All questions relating to the mental incapacity of the testator were correctly submitted to the jury. As the evidence failed to show any undue influence on his mind at the time he executed the will the issue of undue influence was properly withdrawn from the jury.

We discover no error in the answers to the points nor in the general charge.

Judgment affirmed.